Yetta G. Kurland, Esq.
KURLAND & ASSOCIATES, P.C.
304 Park Avenue South, Suite 206
New York, New York 10010
(212) 253-6911
*Attorney for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

JUAN CARLOS MEDINA

                Plaintiff,                Index # 05-CV-6171

-against-                         **AMENDED COMPLAINT**
                                    **AND JURY DEMAND**

JETBLUE AIRWAYS CORPORATION, a/k/a
JETBLUE AIRWAYS, LINDA JOHNSON,
VALERIE JENKINS, and RON HASKIN

                Defendants.

-------------------------------------------------------------------x

        Plaintiff, JUAN CARLOS MEDINA, by his attorneys, Kurland & Associates,

P.C., files this Amended Complaint against Defendants, JetBlue Airways Corporation,

a/k/a JetBlue Airways (hereinafter, "JetBlue"), Linda Johnson [sic], Valerie Jenkins and

Ron Haskin [sic] (collectively, herein after "Defendants"), and respectfully alleges the

following:

## PRIMILINARY STATEMENT

       1.  This is an action in which the Plaintiff, JUAN CARLOS MEDINA,

(hereinafter "Mr. Medina") seeks relief for various causes of action, including,

negligence and unlawful discrimination on the basis of disability, national origin,

citizenship and alienage as to Defendants' violation of his rights and privileges secured

under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq*.

(hereinafter the "ADA"), Title VII of the Civil Rights of 1964, 42 U.S.C. §§ 2000e *et seq*.

("Title VII"), the New York State Human Rights Law, Executive Law § 290 *et seq.*
("Human Rights Law") and the Administrative Code of the City of New York § 8-107 *et
seq.* ("City Law").

2. In this action, Plaintiff seeks compensatory and punitive damages for
Defendants' willful or reckless disregard of his statutorily protected rights, attorneys' fees
and expenses associated with this action, and other legal and equitable relief as this Court
deems appropriate and just.

## JURISDICTION, VENUE AND CONDITIONS PRECEDENT

3. This court has jurisdiction of the subject matter of this case pursuant to 28
U.S.C. Sections 1331, 1343, and 1367. This action is authorized by Section 107(a) of the
ADA, 42 U.S.C. § 12117(a), which incorporates by reference Sections 706(f) of Title VII
of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and Section 102 of the Civil
Rights Act of 1991, 42 U.S.C. § 1981a, and 29 C.F.R. § 1601.28.

4. Venue is proper in the United States District Court, Southern District of New
York pursuant to 28 U.S.C. Sec. 1391(b) and (c).

5. Plaintiff has received a "Right to Sue" letter from the EEOC, which letter is
attached hereto as **Exhibit A**. As such Plaintiff has satisfied all conditions precedent to
commencing this action.

## PARTIES

6. Mr. Medina is a resident of this judicial district. At all times relevant hereto,
Mr. Medina has been a person living with HIV and cancer, which are disabilities within
the meaning of the ADA. Mr. Medina is a former employee of Defendant JetBlue.

7. Defendant JetBlue Airways Corporation is a publicly held corporation doing

business in this state in this judicial district and is subject to the jurisdiction of this Court.

8.  On information and belief, JetBlue engages in industry affecting commerce and has had 15 or more employees in each of 20 or more calendar weeks in the current or preceding calendar year. Accordingly, on information and belief, JetBlue is a "covered entity" prohibited from discriminating against individuals with disabilities within the meaning of the ADA and City Law.

9.  Defendant Linda Johnson was employed at JetBlue as an Inflight Supervisor at the time of Plaintiff's employment at JetBlue.

10. On information and belief, Linda Johnson acted as an agent of JetBlue. Accordingly, on information and belief, Linda Johnson is a "covered entity" prohibited from discriminating against individuals on the basis of national origin, alienage or disabilities within the meaning of the ADA and City Law.

11. Defendant Valerie Jenkins is employed at JetBlue as Director of Inflight Service.

12. On information and belief, Valerie Jenkins acted as an agent of JetBlue. Accordingly, on information and belief, Valerie Jenkins is a "covered entity" prohibited from discriminating against individuals on the basis of national origin, alienage or disabilities within the meaning of the ADA and City Law.

13. Defendant Ron Haskin is employed at JetBlue as an Inflight Supervisor.

14. On information and belief, Ron Haskin acted as an agent of JetBlue. Accordingly, on information and belief, Ron Haskin is a "covered entity" prohibited from discriminating against individuals on the basis of national origin, alienage or disabilities within the meaning of the ADA and City Law.

## STATEMENT OF FACTS

15. Plaintiff repeats and reiterates paragraphs "1 through 14" of this Amended Complaint with the same full force and effect as if hereinafter set forth at length.

16. Mr. Medina is infected with HIV, the virus that causes Acquired Immune Deficiency Syndrome (AIDS). As a result of his HIV infection, Mr. Medina is a person with a disability within the meaning of the ADA.

17. Mr. Medina has lump cancer in his right nipple. As a result of his cancer, Mr. Medina is a person with a disability within the meaning of the ADA.

18. Plaintiff was hired as a flight attendant by JetBlue Airways Corporation (hereinafter "JetBlue") on February 3, 2003.

19. Plaintiff started training classes in Miami, Florida on or about February 3, 2003. After two weeks the training class moved to New York City, and continued there for another two weeks. Plaintiff enjoyed the JetBlue training program, and received positive marks and commentary from his trainers and supervisors.

20. Plaintiff felt at this time that JetBlue was going to be a great environment for him, and that this was a career path Plaintiff was well suited for.

21. Starting back in 2001 Plaintiff had been working on his immigration status with Victoria Nealson, an attorney with the HIV Law Project, however, most of his contact with the HIV Law Project was with the paralegal on his file. Initially the paralegal on his file was Rosalda Novoa, later it was Pamela Denzer.

22. At the time Plaintiff was hired by JetBlue Plaintiff had been granted temporary political asylum in the U.S. Plaintiff had surrendered his old passport and was waiting for a new one but in the meantime Plaintiff had a receipt for his old passport indicating his "Asylee" status and his completed Plaintiff-94 with the words "asylum

granted" stamped on it.

23. When Plaintiff finished the JetBlue training program at the end of February, Plaintiff was told by Cathy Westrum in the JetBlue personnel department that Plaintiff would not be given his diploma for completing the training course because Plaintiff did not have his passport.

24. Plaintiff tried to explain to her that Plaintiff was legally allowed to work in the U.S. based on his "Asylee" status, and that Plaintiff should have his new passport soon, but she would not listen.

25. Plaintiff was then put in touch with another member of the JetBlue personnel department, Carlos Soto.

26. Plaintiff explained his situation to Mr. Soto and he agreed to call his immigration lawyer. Plaintiff gave Carlos Soto the general number for the HIV Law Project, and Pamela Denzer's name.

27. Ms. Denzer sent Mr. Soto a letter explaining that his passport application had been sent to the INS and that Plaintiff was still waiting to get a new passport, but in the meantime Plaintiff had a receipt for his old passport indicating his "Asylee" status and his completed Plaintiff-94 with the words "asylum granted" written on it.

28. Based on this letter Mr. Soto told Ms. Westrum that it was ok for him to graduate, and Plaintiff was given his diploma.

29. Plaintiff believed that Mr. Soto's call to the HIV Law Project resulted in the JetBlue personnel department finding out about his HIV status.

30. Comments made to Plaintiff subsequently by his supervisor and other personnel at JetBlue made it clear to him that his HIV status was common knowledge.

31. Upon information and belief, at around this same time a friend of Plaintiff, who was an attorney and who did not know about his HIV status, called Ms. Denzer to

see if he could help Plaintiff get his passport expedited. He was told in the course of that call that he was dealing with "The HIV Law Project" and was told that all of Projects clients have HIV.

32. Throughout March of 2003, while Plaintiff was still waiting for his passport, Plaintiff was working for JetBlue as a flight attendant and only on domestic flights.

33. Even though Plaintiff had made it clear to Crew Services that Plaintiff could not fly to Puerto Rico because of his passport situation, they scheduling him onto flights to Puerto Rico anyway.

34. Plaintiff had to ask repeatedly to be removed from the flights to Puerto Rico and to be kept on domestic flights until Plaintiff got his new passport.

35. Plaintiff was kept on domestic flights through March, but then in or around April of 2003 Crew Services scheduled him onto the Puerto Rico flight again.

36. When Plaintiff told his supervisor, Linda Johnson, that Plaintiff still did not have his passport and could not work those flights, she informed him that Plaintiff was suspended without pay for two weeks due to the absence of his passport and that Plaintiff would be fired if Plaintiff did not get it "soon."

37. This came as a shock to him, as Plaintiff had already done everything possible to get his passport and had been in communication with Ms. Johnson and other personnel at JetBlue regarding the status of his immigration application.

38. Furthermore, JetBlue had already been sent a letter by his immigration attorney making it clear that his attorney and Plaintiff were doing everything within our power to get the passport application approved by the INS as quickly as possible.

39. Notwithstanding any of this, Ms. Johnson was extremely hostile with him. Ms. Johnson made it clear that she would do nothing to work with him on his schedule or give him the opportunity to work on domestic flights until she had the passport.

40. Plaintiff was suspended without pay from April 19, 2003 through May 3, 2003.

41. About this time Plaintiff had begun to notice that Ms. Johnson was much more strict with him than with the other employees, writing him up for the smallest infractions such as forgetting his name tag.

42. Every time Plaintiff interacted with her she would ask him cryptic questions such as asking him if Plaintiff had "something to tell her" about himself, or if there was anything about him that Plaintiff thought she "needed to know." She also kept asking him if Plaintiff really thought JetBlue was "the right place for him."

43. Plaintiff felt this was clearly because he was not a citizen of the United States and because Ms. Johnson knew about his HIV and cancer status.

44. In addition, plaintiff's appearance at that time was such that he was extremely thin, pale, and began experiencing lipodostropy or a "sunken in" look to his cheeks, a symptom that is common with individuals who suffer from HIV or AIDS.

45. Plaintiff felt that Ms. Johnson could see that he was ill. This was reinforced when she stated "we don't want sick people at JetBlue."

46. When Ms. Johnson informed him that Plaintiff would be suspended without pay Plaintiff immediately contacted Ms. Denzer, to see if there wasn't anything we could do to get his passport.

47. She thought it might help if we could get someone in the JetBlue personnel department to write a letter to the INS saying that Plaintiff was an employee there and that Plaintiff needed his passport as soon as possible for work.

48. Ms. Denzer arranged to get this letter and then sent it on to the immigration authorities. Regardless of these efforts, Ms. Johnson would not allow him to return to work until Plaintiff had his new passport, which Plaintiff eventually received in early

May 2003.

49. In or around May 2003 Plaintiff started taking a new medication for a lump cancer which had developed in his right nipple. This, in addition to his regular HIV medication, resulted in stomach problems and severe nausea.

50. The first day Plaintiff took the medication Plaintiff was scheduled on an early flight to New York City from Ft. Meyers, Florida, and due to the flight schedule Plaintiff had to take his medication early and on an empty stomach.

51. Plaintiff found himself severely nauseated by the smell of the coffee Plaintiff was preparing for the snack and beverage service. In fact, Plaintiff believed he would vomit if he had to continue smelling the coffee.

52. Plaintiff told the chief flight attendant about his problem and she assisted him with his service. The chief flight attendant was very understanding about his medication situation and advised him that Plaintiff should tell Crew Services that Plaintiff was sick and needed to be removed from the rest of his flight (as this was only the second day of a three day trip).

53. When he arrived in New York Plaintiff went to Crew Services and spoke to a woman there named Nancy. Plaintiff told her that his medication was making him nauseas and she told him to go home and that she would take care of his schedule.

54. She also said she would call his supervisor, Ms. Johnson, and let her know Plaintiff was sick.

55. When Plaintiff got home Plaintiff called his doctor and made an appointment to see him.

56. Later that same day Ms. Johnson called Plaintiff and yelled at him. Plaintiff tried explaining to her about his cancer medication making him nauseous but she did not care.

57. She said Plaintiff had to give her a doctor's note and demanded it be faxed to her immediately explaining what had happened.

58. Ms. Johnson made a report which was filed in Plaintiff's personal folder which stated that Plaintiff had to be removed from his flight because Plaintiff had gotten sick making coffee. Ms. Johnson yelled at him saying "no one gets sick making coffee." Plaintiff tried to explain to her what happened but she wouldn't listen. At the end of the call she gave him a date to come see her in her office.

59. Plaintiff came to the meeting with Ms. Johnson with the original of the doctor's note Plaintiff had faxed to her.

60. She was extremely angry with him and told him that "we don't need sick people at JetBlue." She said Plaintiff should think about whether or not this job was really right for him since JetBlue needed him and this sort of thing couldn't happen again. She gave him a verbal warning and told him that if Plaintiff got two more Plaintiff would be fired.

61. Plaintiff tried to explain to her about his medication, but she did not care, she simply told him that there was no room for sick people at JetBlue.

62. While Plaintiff believed at the time of our meeting that she already knew Plaintiff was HIV positive Plaintiff was afraid to bring that into our discussion because she had already made it clear that it was not the policy of JetBlue to keep people with serious illnesses in their employ.

63. Plaintiff thought that if she wouldn't accept illness due to cancer medication, she would certainly fire him for having HIV if Plaintiff confirmed it to her.

64. After this incident Plaintiff was afraid to call in sick again, so even when Plaintiff was ill Plaintiff went to work. At this time Plaintiff also tried to fix his employment record by explaining to the General Manager, Valerie Jenkins, that Plaintiff

had gotten sick because of the cancer medication, not because Plaintiff didn't want to fix coffee on his flights.

65. While she seemed receptive, she was noncommittal, leaving it ultimately in Ms. Johnson's hands.

66. Throughout June and July of 2003 Plaintiff worked steadily notwithstanding his health problems. Plaintiff frequently volunteered to help out on new flights and came in on short notice to cover for other employees.

67. Plaintiff was flexible with his schedule, worked hard and received substantial positive feedback from passengers and co-workers regarding his performance. Still, his relationship with Ms. Johnson did not improve and Plaintiff felt like nothing Plaintiff was doing was making a difference as her tone was consistently hostile with him.

68. In or around October of 2003 Plaintiff came down with a fever while waiting to get on a flight Plaintiff was scheduled for. Plaintiff contacted scheduling and was told that Plaintiff should go home.

69. When Plaintiff got home Ms. Johnson called him and again began yelling at him. She threatened to fire him, telling him again that "we don't need sick people at JetBlue."

70. Plaintiff tried to explain to her that it was better that Plaintiff go home, rather than risk giving a cold to the passengers on the flight, or get even sicker on the flight, but she wouldn't listen. She said Plaintiff was wasting her time and threatened to hang up on him.

71. Plaintiff later found out that she reported the phone call as an "incident" and claimed that Plaintiff had been arguing with her on the phone.

72. She demanded a doctor's note, which Plaintiff gave her.

73. In or around September 2003 Plaintiff got a new supervisor, Ron Haskin.

Plaintiff believes this was at Ms. Johnson's request.

74. Mr. Haskin was concerned about the negative notes from Ms. Johnson in his file. He told Plaintiff he would work with him to help repair his record and that if his performance was good he would take the negative notes off his file himself.

75. In or around late September 2003 Plaintiff found out there was an opening in the Marketing Department at JetBlue and the posted requirements for the position indicated that Plaintiff was qualified for it. While Plaintiff enjoyed being a flight attendant, Plaintiff thought a more regular schedule might be better for his health. Plaintiff also thought that due to Ms. Johnson's comments about his disability, which already marred his reputation and record among his supervisors, a different position within the company would be a more positive work environment for him.

76. When Plaintiff applied for the position Plaintiff was told that Plaintiff had to get a transfer letter from his supervisor in order to change positions within the company.

77. However, after putting him off for awhile and not responding to his requests, Mr. Haskin finally refused to give him the letter, saying he felt Plaintiff did not have the "language skills" for a corporate environment.

78. Plaintiff didn't understand how his "language skills" could be sufficient to deal with customers every day on flights but not be sufficient for a corporate environment.

79. Plaintiff believes he really did not want to be known around JetBlue corporate circles as having recommending an HIV positive Hispanic immigrant.

80. Plaintiff was devastated at having his career ambition hampered by this sort of attitude.

81. Around this time it also became clear to him that Mr. Haskin had the same sort of attitude towards him that Ms. Johnson had.

82. Plaintiff believes Mr. Haskin knew Plaintiff had HIV and was reluctant to deal with him.

83. On or around December 19, 2003, Plaintiff developed bronchitis and had a few asthma attacks. Plaintiff was not feeling well enough to work the flight Plaintiff was scheduled on that day. However, after being told by Ms. Johnson that sick people were not welcome at JetBlue and with the recent chill in his relations with Mr. Haskin Plaintiff was very scared to call in sick.

84. Plaintiff decided instead to call scheduling and try to have his schedule changed, in the hopes that Plaintiff could get a few days to recover without calling in sick and getting fired.

85. When Plaintiff was asked by crew services why Plaintiff needed his schedule changed Plaintiff said Plaintiff had another obligation that day Plaintiff needed to attend to.

86. They told him there was nothing they could do and there were not enough crew members to cover his flight.

87. Plaintiff thereafter called his doctor to ask him what Plaintiff should do. His doctor could not see him that day, but he advised Plaintiff that it was very important that Plaintiff rest because it would be very dangerous for him if Plaintiff were to develop pneumonia with his condition.

88. He called in a prescription for Plaintiff and made an appointment to see him at his office. But his next available appointment was not until December 23, 2003.

89. After speaking with his doctor Plaintiff decided it was not worth the risk to his health to work in his condition, so Plaintiff called scheduling back and admitted that Plaintiff was sick and would not be able to work.

90. Plaintiff went to the doctor on December 23 and had him write him a letter to

bring in to work explaining his situation. Plaintiff missed work over the next two weeks
but returned to work on December 30, 2003 even though Plaintiff had not fully recovered
and was taking medication which was making him dizzy.

91. Plaintiff continued to work the next few days, completing his scheduled
flights on New Years Eve and New Years day 2004.

92. When Plaintiff went to speak to Mr. Haskin about his absence and give him
his doctor's note he told him that Scott from crew services had told him that Plaintiff had
called in sick on the December 19th because Plaintiff had something else to do. Mr.
Haskin told him that based of his record Plaintiff was in serious danger of getting fired,
and that Ms. Jenkins was very unhappy about the situation.

93. Plaintiff explained to him that Plaintiff was still taking medication that was
making him dizzy and Plaintiff asked him if he could move him to another flight from the
January 2, 2004 red-eye Plaintiff was scheduled to work, because that would have three
red-eyes in a row for him. Plaintiff asked him to please move him to a daytime flight that
same day.

94. Mr. Haskin refused to change Plaintiff's schedule, and told him that if
Plaintiff was still feeling sick and dizzy and couldn't work three red-eyes in a row,
Plaintiff should not be at work at all.

95. So Plaintiff went home and was out sick again on January 2, 2004. When
Plaintiff reported in to work on January 4, 2004 Plaintiff was told that Plaintiff was fired.

96. When Plaintiff got the final statement for his retirement plan it said that his
last day was December 28th, as did most of the papers Plaintiff received after his
termination. However, Plaintiff had worked a three day flight over December 30, 31st
and January 1.

97. Plaintiff feels he suffered discrimination at a variety of points in his time at

JetBlue. Plaintiff was discriminated against based on his alienage and natural origin resulting in his being wrongfully singled out, embarrassed in front of his training class and finally suspended without pay.

98. Plaintiff was treated in a humiliating and degrading manner by Ms. Johnson at every turn as she tried to get him to leave rather than deal with his disability. Plaintiff believes that both Ms. Johnson and Mr. Haskin did not want to have to work with an HIV+ Hispanic immigrant and did everything in their power to make it impossible for him to work at JetBlue.

99. Neither of them made even the slightest effort to reasonably accommodate him by making minor adjustments to his schedule, such as permitting him to work on shorter domestic flights thereby reducing aggravation to his medical disabilities, nor did either of them comply with JetBlue's own policy and allow him to use accrued sick days when his illness required it.

100. Plaintiff was denied a recommendation for a lateral transfer within JetBlue by Mr. Haskin due to his shame at being associated with him. Ultimately Plaintiff was wrongfully terminated, but only after working a grueling New Years shift.

101. On or about August 18, 2004, Mr. Medina filed a timely charge of discrimination with EEOC alleging that Defendants' actions on the basis of his HIV and immigration status violated the anti-discrimination provisions of the ADA.

102. On or about June 2, 2005, the EEOC issued to Mr. Medina a Notice of Right to Sue in connection with the charge.

103. Mr. Medina has exhausted the administrative remedies available to him under the ADA. All conditions precedent to the institution of this suit have been fulfilled.

## AS FOR THE FIRSTCAUSE OF ACTION
## UNLAWFUL DISCRIMINATION UNDER TITLE I OF THE ADA

104.    Plaintiff repeats and reiterate each and every allegation contained in the

foregoing paragraphs numbered "1" through "103," with the same full force and effect as

if hereinafter set forth at length.

105.    Title I of the ADA, 42 U.S.C. §§ 12111-12117, prohibits covered entities

from discriminating against otherwise qualified people with disabilities in the terms,

conditions or privileges of employment.  This prohibition similarly protects people whom

covered entities regard as disabled.

106.    Due to his HIV status and cancer-related illnesses, Mr. Medina has

physical impairments that substantially limit one or more of his major life activities, such

that he is a person with a disability within the meaning of the ADA.

107.    Additionally, because of the fact that Mr. Medina is HIV-positive and has

cancer, Defendants regard Mr. Medina as having a physical impairment that substantially

limits one or more of his major life activities, such that he is a person with a disability

within the meaning of the ADA.

108.    Additionally, due to his HIV status and cancer-related illnesses, Mr.

Medina has a record of physical impairments that substantially limits one or more of his

major life activities, such that he is a person with a disability within the meaning of the

ADA.

109.    Mr. Medina is and was capable of safely performing all the essential

functions of the position of Flight Attendant for Defendants with reasonable

accommodation.  Defendants violated Title I of the ADA when it denied Mr. Medina

reasonable accommodation, wrongfully terminated his employment and discriminated against him on the basis of his HIV status and cancer-related illnesses.

110.     By terminating Mr. Medina's employment on the basis of his HIV status and cancer-related illnesses, Defendants violated Title I of the ADA.  Additionally, by terminating Mr. Medina's employment because of their perception that Mr. Medina's HIV infection and cancer-related illnesses rendered him unqualified to perform his duties, Defendants violated Title I of the ADA.

111.     Defendants knew their actions constituted unlawful discrimination on the basis of disability and acted with malice or with reckless indifference to Mr. Medina's statutorily protected rights.

112.     Plaintiff was severely damaged as a result of Defendants' action, losing wages and benefits and suffering the stigma and loss of professional standing associated with Defendants' discriminatory treatment of him.  Plaintiff is entitled to compensation for mental anguish, lost benefits and lost wages, and the other relief herein requested.

## AS FOR THE SECOND CAUSE OF ACTION
## UNLAWFUL DISCRIMINATION UNDER TITLE VII

113.     Plaintiff repeats and reiterate each and every allegation contained in the foregoing paragraphs numbered "1" through "112," with the same full force and effect as if hereinafter set forth at length.

114.     By the acts and practices described above, Defendants have discriminated against Mr. Medina because of his national origin, in violation of Title VII.

115.     Defendants knew their actions constituted unlawful discrimination on the basis of national origin and/or showed disregard for Mr. Medina's statutorily protected rights.

116.    Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' discriminatory conduct.

## AS FOR THE  THIRD CAUSE OF ACTION
## UNLAWFUL DISCRIMINATION UNDER
## THE NEW YORK STATE HUMAN RIGHTS LAWS

117.    Plaintiff repeats and reiterate each and every allegation contained in the foregoing paragraphs numbered "1" through "116," with the same full force and effect as if hereinafter set forth at length.

118.    By the acts and practices described above, defendants have discriminated against Plaintiff because of his national origin and disability in violation of the Human Rights Laws of the State of New York.

119.    Defendants knew that their actions constituted unlawful discrimination on the basis of national origin and disability and/or showed disregard for Ms. Medina's statutorily protected rights.

120.    Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' discriminatory conduct.

## AS FOR THE FOURTH CAUSE OF ACTION
## UNLAWFUL DISCRIMINATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE

121.    Plaintiff repeats and reiterate each and every allegation contained in the foregoing paragraphs numbered "1" through "120", with the same full force and effect as if hereinafter set forth at length.

122.    By the acts and practices described above, defendants have discriminated against or aided and abetted in the discrimination of Mr. Medina because of his national origin, alienage, citizenship and disability in violation of the City Law.

123.    Defendants knew their actions constituted unlawful discrimination or aiding and abetting in the unlawful discrimination on the basis of national origin alienage, citizenship and disability and/or showed disregard for Mr. Medina's statutorily protected rights.

124.    Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' discriminatory conduct.

## AS FOR THE FIFTH CAUSE OF ACTION
## UNLAWFUL RETALIATION UNDER TITLE VII

125.    Plaintiff repeats and reiterate each and every allegation contained in the foregoing paragraphs numbered "1" through "124," with the same full force and effect as if hereinafter set forth at length.

126.    By the acts and practices described above, defendants have retaliated against Mr. Medina for having complained about discrimination in violation of Title VII.

127.    Defendants knew their actions constituted unlawful retaliation on the basis of national origin and/or showed disregard for Mr. Medina's statutorily protected rights.

128.    Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' retaliatory conduct.

## AS FOR THE SIXTH CAUSE OF ACTION
## UNLAWFUL RETALIATION UNDER
## THE NEW YORK STATE HUMAN RIGHTS LAWS

129.    Plaintiff repeats and reiterate each and every allegation contained in the foregoing paragraphs numbered "1" through "128," with the same full force and effect as if hereinafter set forth at length.

130.    By the acts and practices described above, defendants have retaliated against Plaintiff because of his national origin and disability, in violation of the Human Rights Laws of the State of New York.

131.    Defendants knew that their actions constituted unlawful retaliation on the basis of national origin and disability and/or showed disregard for Ms. Medina's statutorily protected rights.

132.    Plaintiff is now suffering irreparable injury and monetary damages as a result of defendants' retaliatory conduct.

## AS FOR THE SEVENTH CAUSE OF ACTION
## UNLAWFUL RETALIATION UNDER
## THE NEW YORK CITY ADMINISTRATIVE CODE

133.    Plaintiff repeats and reiterate each and every allegation contained in the foregoing paragraphs numbered "1" through "132", with the same full force and effect as if hereinafter set forth at length.

134.    By the acts and practices described above, defendants have retaliated against Mr. Medina because of his national origin, alienage, citizenship and disability in violation of the City Law.

135.    Defendants knew their actions constituted unlawful retaliation on the basis of national origin, alienage, citizenship and disability and/or showed disregard for Mr. Medina's statutorily protected rights.

136.    Plaintiff is now suffering irreparable injury and monetary damages as a result of Defendants' retaliation conduct.

## AS FOR THE SEVENTH CAUSE OF ACTION
## NEGLIGENCE

137.    Plaintiff repeats and reiterate each and every allegation contained in the foregoing paragraphs numbered "1" through "136", with the same full force and effect as if hereinafter set forth at length.

138.    Defendants had a duty to provide the Plaintiff with a work environment free from hostility and discriminatory practices.

139.    Defendants breached that duty by engaging in numerous acts of discrimination against Plaintiff.

140.    Plaintiff's aggravated illness, loss of income and other injuries are a direct result of Defendants wrongful conduct and breach of their duty to protect Plaintiff.

141.    Defendants knew their actions constituted negligence and acted with malice or with reckless indifference to Mr. Medina's protected rights.

142.    Plaintiff is now suffering irreparable injury and monetary damages as a result of Defendants' negligence.

## AS FOR THE SEVENTH CAUSE OF ACTION
## PRIMA FACIE TORT

143.    Plaintiff repeats and reiterate each and every allegation contained in the foregoing paragraphs numbered "1" through "142", with the same full force and effect as if hereinafter set forth at length.

144.    Defendants intentionally, negligently and recklessly inflicted harm upon Plaintiff by discriminating against him because of his disabilities, national origin, alienage and citizenship, thereby causing him stress and further aggravating his illness.

145.    As a result of Defendants' actions, including, but not limited to, requiring Plaintiff to work when he was ill, mocking his illnesses and disabilities, making

disparaging comments about his illnesses, penalizing him for his alienage and otherwise discrimination against him, Plaintiff's illness became further aggravated causing him to ultimately lose his job.

146.    Defendants unjustifiably terminated Plaintiff's employment with the knowledge that Plaintiff is an immigrant with HIV and cancer. Defendants' actions were motivated by discrimination and/or showed disregard for Mr. Medina's statutorily protected rights.

147.    Plaintiff is now suffering irreparable injury and monetary damages as a result of Defendants' actions.

## JURY DEMAND

148.    Mr. Medina demands a trial by jury in this action on each and every one of his damage claims.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff JUAN CARLOS MEDINA demands judgment as follows:

a)  As against JETBLUE AIRWAYS CORPORATION, a/k/a JETBLUE AIRWAYS, compensatory damages in an amount to be determined at trial but in no event less than $10 million, together with punitive damages in an amount to be determined at trial;

b)  As against LINDA JOHNSON, compensatory damages in an amount to be determined at trial but in no event less than $10 million;

c)  As against VALERIE JENKINS, compensatory damages in an amount to be determined at trial but in no event less than $10 million;

d)  As against RON HASKIN, compensatory damages in an amount to be

determined at trial but in no event less than $10 million;

e)   Attorney's fees and expenses pursuant to 42 U.S.C. Sec. 1988 and as

otherwise allowed by law and the Court's inherent power;

f)   Prejudgment interest as allowed by law; and

g)   Such other and further relief as this Court may deem appropriate and just.


Dated:      November 4, 2005
            New York, New York

                         Respectfully Submitted,

                         **YETTA G. KURLAND, ESQ.**

                 **BY:    s/ Yetta G. Kurland, Esq.**
                         **YETTA G. KURLAND, ESQ.**
                         Kurland & Associates, P.C.
                         304 Park Avenue South, Suite 206
                         New York, New York 10010
                         (212) 253-6911